MICHAEL SUHADOLNIK, Plaintiff-Appellee, v. THE CITY OF SPRING-
FIELD, Defendant-Appellant (Richard J. Zimmerman *et al.*, Defendants).—
MICHAEL SUHADOLNIK, Plaintiff-Appellant, v. THE CITY OF SPRING-
FIELD, Defendant (Richard J. Zimmerman *et al.*, Defendants-
Appellees).—MICHAEL SUHADOLNIK, Plaintiff-Appellant, v. THE CITY
OF SPRINGFIELD, Defendant-Appellee (Richard J. Zimmerman *et al.*,
Defendants).

Fourth District Nos. 4—88—0836, 4—88—0860, 4—88—0879 cons.

Opinion filed June 15, 1989.—Rehearing denied July 14, 1989.

156

James K. Zerkle and Douglas T. Wilcox, Corporation Counsel, of Springfield, for City of Springfield.

Patrick James Smith, of Delano Law Offices, P.C., of Springfield, for Michael Suhadolnik.

Paul E. Adami, of Mohan, Alewelt & Prillaman, of Springfield, for appellees Richard J. Zimmerman, Timothy Call, and James A. Rogers.

JUSTICE SPITZ delivered the opinion of the court:

Plaintiff Michael Suhadolnik is the owner of real estate located at 410 N. Amos Avenue, Springfield. Plaintiff, wanting to construct a day-care center on the site, sought to have the zoning changed from R-3 (single-family residences and duplexes) to R-5(b) (general residence and office district). After the rezoning was denied, plaintiff initiated this lawsuit in the circuit court of Sangamon County.

The complaint is in three counts: count I asked the court to declare the zoning ordinance of defendant City of Springfield (City) to be unconstitutional and to grant plaintiff a reclassification; count II sought damages from the City for taking plaintiff's property without just compensation; and count III sought damages from individual defendants Richard J. Zimmerman, Timothy Call, and James Rogers for allegedly false statements these defendants made with the intent to prevent plaintiff from obtaining a zoning reclassification.

At the time plaintiff purchased the real estate it had been vacant since 1955. The property was zoned by the City as R-3, which only allowed the construction of single-family residences and duplexes.

Concerning the property and the surrounding area, the plaintiff's complaint alleges approximately 1.1 acres of the 4.23-acre subject property will be acquired by the State of Illinois for the construction of the Jefferson-Madison Street corridor. Plaintiff intended to develop a day-care center on 2.13 acres, leaving one acre for further development. The property around the subject property is zoned as follows: on the east are multifamily buildings zoned R-5, general residence and office district; to the immediate north is the proposed ramp for the Jefferson-Madison Street corridor, and across Jefferson, the property is zoned B-1, highway business service district; across Amos Street, to the west some of the property is within the corporate limits of Sangamon County, zoned R-2 and B-3, and some is within the City's limits, zoned R-3, single family and duplex residence district; and on the south, the property is zoned R-3.

In March 1988, plaintiff applied for zoning reclassification of the subject property to an R-5(b) category to allow for the construction of a children's day-care center. On April 20, 1988, the Springfield Planning and Zoning Commission, an advisory board of the City, recommended the subject property be zoned in accordance with plaintiff's request. The Springfield Planning and Zoning Committee also recommended rezoning. The factors supporting reclassification were that the property was suited to the proposed classification, a contiguous property was recently granted R-5 zoning, the reclassification was consistent with the existing zoning and uses of the surrounding property, the reclassification was consistent with the City's comprehensive plan, and the Madison Street corridor will cross the property. However, on May 17, 1988, the Springfield city council denied the plaintiff's petition for rezoning of the subject property.

After the plaintiff filed his petition with the department of planning and zoning, it is alleged the individual defendants discussed the plaintiff's petition for reclassification with persons who, like defendants, lived near the subject property, and in said conversations expressed their views in opposition to plaintiff's development of the subject property. As alleged in plaintiff's complaint, the defendants disseminated the following false information concerning the plaintiff's intended development of the property as a day-care center: the proposed day-care facility would be open 24 hours a day; would be owned and/or operated by St. John's Hospital; would be directly north of 260 North Columbia Avenue; would accommodate several hundred children; would increase traffic flow by 300 to 400 vehicles per day; is the same one originally proposed for an eastside area of the City of Springfield, and made other remarks to discredit the proposed day-

care center. The plaintiff further alleged in his complaint that the statements were made by the defendants knowing the statements were false, were made without legal justification and with the intent to deny the plaintiff the relief he requested from the City, to prevent the plaintiff's development of the subject property, and to disparage the plaintiff in the community.

Thereafter, plaintiff filed his three-count complaint. The City answered count I of the complaint, but moved to dismiss count II of plaintiff's complaint pursuant to section 2—615 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1987, ch. 110, par. 2—615) for failure to state a cause of action. On the City's motion, the trial court dismissed count II of plaintiff's complaint with prejudice on October 31, 1988.

On June 30, 1988, the defendants filed a motion to dismiss count III of plaintiff's complaint. On July 1, 1988, the plaintiff served upon each of the individual defendants interrogatories and requests to produce documents. The defendants filed a motion for protective order or to quash the notice of depositions. The trial court entered an order granting defendants' motion and staying depositions until defendants' motion to dismiss was heard and ruled on by the trial court. On July 25, 1988, the trial court, by docket entry, dismissed count III with prejudice. No Supreme Court Rule 304(a) (107 Ill. 2d R. 304(a)) finding was made at that time. Subsequently, the defendants filed a motion for attorney fees. After hearing arguments of counsel, the trial court granted the defendants' motion and assessed the defendants' attorney fees and expenses against the plaintiff and plaintiff's counsel pursuant to section 2—611 of the Code. (Ill. Rev. Stat. 1987, ch. 110, par. 2—611.) The trial court directed counsel for plaintiff and defendants to meet and attempt to agree on the appropriate sum for attorney fees and costs. On October 21, 1988, the trial court entered a written order dismissing count III of plaintiff's complaint with prejudice and a written order assessing attorney fees and costs against the plaintiff and plaintiff's counsel. As to both orders, a Rule 304(a) finding was also made. From these orders, plaintiff appealed, docket No. 4—88—0860.

As to count I, the plaintiff filed a motion for summary judgment, a memorandum in support of the motion for summary judgment and, later, a supplement to the motion for summary judgment. The City filed a memorandum in opposition to the motion. The trial court heard arguments of counsel and found that the R-3 classification was unreasonable and an R-5(b) classification would be reasonable. The trial court entered a written judgment in favor of the plaintiff on October

31, 1988. The City appealed the summary judgment, docket No. 4—88—0836, and plaintiff appealed the dismissal of count II, docket No. 4—88—0879. All appeals were consolidated.

■ The first issue to be considered is whether the trial court erred in granting summary judgment in favor of plaintiff on count I because genuine issues of material fact remained to be considered. In *Reed v. Bascon* (1988), 124 Ill. 2d 386, 393, 530 N.E.2d 417, 420, the Illinois Supreme Court recently reviewed the standards for granting summary judgments:

> "Section 2—1005(c) of the Civil Practice Law (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c)) provides that summary judgment shall be granted 'if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Although summary judgment is to be encouraged as an aid in the expeditious disposition of a lawsuit (*Allen v. Meyer* (1958), 14 Ill. 2d 284, 292), it is a drastic measure and, therefore, should be allowed only when the right of the moving party is free from doubt (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240; *Beverly Bank v. Alsip Bank* (1982), 106 Ill. App. 3d 1012, 1016). The court must construe the pleadings, depositions, admissions, exhibits, and affidavits on file strictly against the movant in determining whether a genuine issue of material fact exists. *Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 398."

Where the matter before the trial court can be decided as a question of law, the case is a proper one for summary judgment. See *Smith v. Rengel* (1981), 97 Ill. App. 3d 204, 422 N.E.2d 1146; see also *Lewis v. Illinois Institute of Technology* (1977), 50 Ill. App. 3d 418, 365 N.E.2d 1079.

■ The City frames its issue in the language that material questions of fact remain. On the other hand, the City argues not that the facts are disputed or contradicted, but only that, as applied to the factors for determining the reasonableness of the zoning ordinance, the trial court's decision is unsupported. No genuine issue of material fact remains. The facts are before the court. Whether, under the facts of this case, the zoning ordinance, as applied, is unconstitutional is a question of law. This was a proper case for summary judgment and the only question is whether the trial court's determination was correct.

■ Enacting a zoning ordinance is a legislative function, and once a legislative body has enacted legislation in response to a need to

protect and promote the general welfare of its citizens, there is a presumption the enactment is a valid exercise of police power. Therefore, a home rule unit may enact any zoning ordinance it desires as long as it meets constitutional requirements. Insofar as they operate to limit the exercise of police power, the due-process clauses of the Federal and State Constitutions proscribe only the unreasonable or arbitrary use of such power. Thus, the zoning ordinance must not only bear a reasonable relationship to the protected public interest, but the means utilized must also be a reasonable method for accomplishing the objective. *Scandroli v. City of Rockford* (1980), 86 Ill. App. 3d 999, 408 N.E.2d 436.

■ A zoning ordinance may be valid in general, but invalid as to a particular piece of property. (*Petropoulos v. City of Chicago* (1955), 5 Ill. 2d 270, 125 N.E.2d 522.) To overcome the presumption of validity, the property owner must show the ordinance, as applied to the subject property, is arbitrary, unreasonable and without substantial relation to the public health, welfare, and safety. (*Welch v. City of Evanston* (1978), 65 Ill. App. 3d 249, 382 N.E.2d 615.) The presumption of validity must be overcome by clear and convincing evidence. *Coney v. County of Du Page* (1977), 51 Ill. App. 3d 980, 367 N.E.2d 152.

■ Ordinarily, before resorting to the courts, a party must exhaust all administrative remedies. Plaintiff could have sought a variance. The variance procedure is designed to provide a flexible way to relieve rigid zoning requirements in individual cases. (*Sinclair Pipe Line Co. v. Village of Richton Park* (1960), 19 Ill. 2d 370, 167 N.E.2d 406.) However, where a property owner's application for reclassification has been rejected, the property owner need not apply for a variance in order to exhaust administrative remedies before proceeding to challenge the ordinance in court. *Liebling v. Village of Deerfield* (1961), 21 Ill. 2d 196, 171 N.E.2d 585.

■ There are several factors which courts consider to determine the constitutionality of a zoning decision. The six factors set out in *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 46-47, 145 N.E.2d 65, 69, are:

"(1) The existing uses and zoning of nearby property [citations], (2) the extent to which property values are diminished by the particular zoning restrictions [citations], (3) the extent to which the destruction of property values of plaintiff promotes the health, safety, morals or general welfare of the public [citations], (4) the relative gain to the public as compared to the hardship imposed upon the individual property owner [citations], (5) the suitability of the subject property for the zoned

purposes *** [citations], and (6) the length of time the property has been vacant as zoned considered in the context of land development in the area in the vicinity of the subject property.''

Since no one factor is controlling, they should be reviewed in the aggregate and not individually. In addition, there are two additional factors more recently recognized as requiring consideration: the evidence or lack of evidence of community need for the proposed use and the care with which the community has undertaken to plan its use development. *Sinclair Pipe Line Co.*, 19 Ill. 2d 370, 167 N.E.2d 406.

■ In *Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 402 N.E.2d 719, the court pointed out that before the unreasonableness of the ordinance can be considered, the reasonableness of the proposed use must be established. The court proceeded to discuss the use in relation to the factors hereinbefore discussed, and it would seem, therefore, that the analysis of the reasonableness of the proposed use and unreasonableness of the ordinance are interrelated.

The facts available for the trial court to consider in ruling on the motion for summary judgment are these. The City passed its current comprehensive land use plan on July 19, 1983. This plan governs the use of land within the City until the year 2000 A.D. The affidavit of Mr. Keith Haynes, the director of planning and zoning and chairman of the Comprehensive Plan Task Force, indicates that the comprehensive land use plan for the City of Springfield designates part of the subject property for multiple-family development, and part of the property for single-family and duplex use. The zoning classifications which most closely approximate the uses allowed for the subject property are R-4 (general residence district) and R-3 (single-family and duplex residence district). The plan also contains an R-5(b) classification entitled multifamily and office use, which most nearly resembles the classification requested. The subject property has not been designated for multiple family-office use in the plan.

The subject property is bounded on the south by property zoned R-3 (single family and duplex district), which property has been used as single-family residences for 30 years. On the east is property zoned R-3 (single family and duplex) and R-4(c) (multiple-family district) and used as single-family residences for 30 years, with apartments for approximately three years. To the west, the property is zoned R-3 and has been used as residences for many years. To the north and across Jefferson Street the property is zoned R-3 and B-1 (highway business service district) and is used for commercial purposes. The subject parcel is bounded by Amos Avenue on the west and Jefferson Street on

the north. The only commercially zoned properties adjacent to the parcel are across Amos Avenue and Jefferson Street. The use of all land immediately adjoining the parcel is in single-family residential structures, with the exception of a multiple-family apartment development near the southeast corner of the property.

The subject property had been zoned R-3 prior to plaintiff purchasing the property. Plaintiff filed his petition for rezoning on March 18, 1988. The trustee's deed indicates the property was granted to plaintiff on April 6, 1988. Plaintiff apparently purchased the property with full knowledge of the existing zoning restrictions. Although plaintiff states in his affidavit that the property has remained vacant since 1955, there is nothing in the record to indicate any effort on the part of former owners to develop the property or market the property for its zoned purposes since 1955. Plaintiff's affidavit also states that prior to purchasing the real estate, plaintiff and Judy Kjellander surveyed the area to determine the need for a day-care center by studying the number of children in a seven-block radius and discussing the need with Monsignor Wright of St. Agnes Parish. Plaintiff also determined the day-care centers in the area had long waiting lists.

Plaintiff's letter to the mayor proposing the zoning reclassification began thusly:

> "A proposed zoning change from R-3 to R-5b for day care will be presented at Tuesday, May 17, 1988 meeting. The land addressed at 410 N. Amos is 4.23 undeveloped acres. A proposed day care facility will occupy 2.1 acres. The State will take approximately 1.1 acres to the North for the Madison Avenue Ramp. One acre of very irregular terrain to the East will be left vacant."

A copy of this letter was attached to plaintiff's response to request to produce documents. As part of the letter there is a drawing of the proposed improvements.

When plaintiff purchased the property, it was zoned R-3. R-3 permits single-family residences and duplexes plus all uses permitted under R-1 and R-2. R-1 and R-2 uses include: single-family detached residences; agricultural; and community facilities for the educational and spiritual needs of neighborhood residents, including noncommercial athletic fields, churches, colleges or universities, community centers, public or private elementary schools, family-care facility, high school or junior high school, park, or family day-care home. There are also special permit conditional uses allowed under R-1 and R-2: cemeteries or mausoleums; electric substations, gas valve, and regulator sites serving a distribution area; fire or police stations; telephone ex-

changes; water or sewer pumping stations; nonbusiness clubs; radio and television transmission towers; nurseries (without greenhouses); and riding stables. R-5(b) provides for all facilities permitted under R-4, general residence district, as well as permitting "[p]rofessional and administrative office uses which may appropriately be located in medium or high density residential areas to provide professional or essential services for the residents of the community or employment for the large percentage of the office workers who live in nearby apartments, or can perform their activities more effectively in a residential environment, unaffected by objectionable influences from commercial or residential users, and do not create significant objectionable influence in residential areas." Among the uses specifically enumerated R-5(b) uses are: answering services; nonretail business, professional, or governmental offices; business schools or colleges; dental, medical, or osteopathic offices or clinics; some medical or dental laboratories; and wholesale offices restricting samples to no more than 20% of total floor area.

After reviewing the matter, the Springfield Planning and Zoning Commission voted 7 yes, 2 no, to recommend the rezoning of the subject property to R-5(b) be granted. The Springfield-Sangamon County Regional Planning Commission made the following recommendation:

"Recommend approval. The rezoning is seen as appropriate due to the. compliance with the [City Comprehensive Plan], the trend in the area and due to the fact that Madison Street will cut through the property."

The affidavit of James Slifer, District Engineer of the Illinois Department of Transportation, indicated that the construction of the proposed ramp is to be completed as part of the Clearlake-Madison-Jefferson Corridor and would require the State to acquire property on the southeast corner of the intersection at Amos and Jefferson Streets. Relied upon heavily by the parties are the appraisals of C. Wayne Briggs and William Butcher.

Briggs has this to say about the subject property and the proposed use:

"The subject property at present, is a vacant 4.17 acre tract of land which is zoned R-3, Single Family Duplex. This land has convenient access to the adjacent or nearby roadways, and utilities are available in sufficient quantity and quality for most any foreseeable future use of the property. Further, the topography of subject would not adversely affect the site for most potential uses.

The subject neighborhood is discussed earlier in this report.

It was noted in that discussion that a residential subdivision is to the south and west, and a relatively new apartment complex joins at the east. The land use trend along Jefferson Street is quite clearly to commercial usage. The apartments built to the south (along Mossman and Washington) indicate that multi-family use is a trend in the subject neighborhood. The success of nearby apartment complexes indicates that there is a demand for multi-family. There appears, however, to be little office building or higher density apartment use in the neighborhood.

Considering the subject's size, access, utility availability, and neighborhood trends, it is my opinion that the most logical use of the subject would be for multi-family development. It is further my opinion, based upon trends and neighboring uses, that a multi-family use density compatible with R-4 zoning (1 unit/ 1500 sq. ft. of land) would be both conforming to the neighborhood trend and a profitable use."

Briggs appraised the property at $118,000 if zoned R-3, $136,000 if zoned R-4, and $145,000 if zoned R-5, then continued:

"The residential subdivision to the south of subject is bordered by an apartment complex to the east, a school to the southwest and scattered apartment buildings a short distance southerly [sic]. These adjacent uses create considerable vehicular traffic in the adjacent subdivision (Sacred Heart Grove). The use of the subject property (now vacant) for any use which utilizes Columbia Avenue as an entrance/exit, will, of course increase vehicular traffic in this subdivision.

Increases in traffic flow in a residential neighborhood may cause a loss of peace and quiet, and, to a certain extent, it will change the character of the neighborhood. Individual property owners, however, have no vested interest in the flow (increase or decrease) of traffic in a dedicated roadway. It is felt that the normal growth of the city and the transition of the subject neighborhood is causing increased vehicular traffic in this adjacent subdivision. The development of subject property for whatever use will cause increased traffic on a small portion of Columbia Avenue. This increased traffic is considered to be the result of normal development and growth, and as such, is not considered to result in any compensable damage to the subdivision or residences therein.

There is a proposed ramp which will be a part of the Madison Street Project, cutting across the north part of the subject property. This ramp will be one-way east and be part of a ma-

jor east-west thoroughfare. There will be no direct access from the subject to this ramp, however, there will be good visibility. Access from subject to this ramp will be convenient from Amos Avenue. This visibility and good access to the ramp will make subject quite accessible to much of Springfield.

This type of access and exposure would be beneficial to almost any use of subject under zoning from R-3 to R-5. This beneficial visibility and access is a general benefit to the entire neighborhood, however, and not limited to the subject. This proposed ramp has, on the other hand, been planned for many years. The acquisition from subject for this ramp is not yet on the five-year program. Any benefit to subject from this ramp and improved access to other areas of the city needs to be discounted for the time which might pass before construction is complete. Furthermore, there remains some 'speculation' as to when and precisely where such a ramp will be constructed. Stranger things have happened than that of having future highway plans undergo changes of alignment. In summary, however, it is my opinion that if and when such a ramp is constructed, it will have a positive influence upon whatever (R-3 to R-5) use is being made of the property."

In an affidavit submitted by the City in opposition to the motion for summary judgment, Briggs gave the following explanations:

"3. Page seven of said report contains my analysis of the highest and best use of the subject property, which I have determined to be multi-family residential use consistent with densities permitted in the R-4(d) zoning classification of the Springfield Zoning Ordinance.

4. Because of the lack of office use or higher density apartment use in the neighborhood, which would be allowed in the R-5(b) zoning classification (one dwelling unit per 1,000 square foot of lot area), I feel that uses allowed in the R-5(b) zoning classification are too intense and do not constitute the highest and best use of the subject property."

After noting that plaintiff purchased the subject property for $111,500, Butcher makes the following analysis of the neighborhood and site:

"Subject's neighborhood could be delineated with the northern boundary being West Jefferson Street, the eastern boundary being North MacArthur Boulevard, the southern boundary being West Washington Street and the western boundary being Bruns Lane (Chatham Road). Approximately fifty percent of

the neighborhood west of North Amos Avenue is located outside the corporate limits of Springfield, Illinois. The balance of the neighborhood land area is located within the Springfield, Illinois, corporate limits. The neighborhood is a mixture of unimproved vacant land, commercial, multiple-family, schools (elementary and high school), single family and duplex residence use. Also, a new church is under construction on the west side of the 200 block of North Amos Ave. Two large multiple-family facilities are located in the neighborhood, as well as, [*sic*] two smaller multiple-family units located in the northwest quadrant of the intersection of West Washington and North Lincoln Streets. The commercial uses are located on West Jefferson Street and Bruns Lane (CHATHAM ROAD). Major road realignment is being planned by the State of Illinois, Department of Transportation, in the area of North Amos Ave. and West Jefferson Street. The proposed project is more commonly known as the Madison Street Corridor. Two eastbound ramps will be constructed in the southwest quadrant of the intersection of West Jefferson Street and North Amos Ave. These two ramps will converge and cross over West Jefferson to connect with West Madison Street. Madison will be one-way eastbound to approximately Eleventh Street. Jefferson Street will be one-way westbound from approximately Eleventh Street to North Amos Ave. West Jefferson Street will be a two-way Street west of North Amos Ave. The exact date that construction will begin is unknown to this appraiser.

The neighborhood is in the path of progress and would support a development of some type at subject's location. Due to the proposed ramps to be located at the north end of subject property which will feed into the Madison Street Expressway, it is unlikely, in my judgment, that a single-family or duplex project would be viable at this location.

The central business district is located approximately one mile to the east, along with the State of Illinois Capitol Complex.

Jefferson Street, in subject area, has seen a good deal of transition in recent years with the conversion of many properties from residential to commercial/industrial use. The residential areas surrounding subject in the immediate area, are comprised of fairly new homes to older homes, with values ranging from $25,000 to $80,000. The commercial uses in the immediate area serve not only the surrounding neighborhoods, but the en-

tire community as well.

## SITE ANALYSIS

Subject site is irregularly shaped, containing slightly over 4 acres and having approximately 227.4 lineal feet of frontage on North Amos Ave. The western part is level with cleared area. The eastern part is timbered and has sloping topography. There is also an access point on the north side of Columbia Ave., approximately 172.30' east of North Amos Ave. The site is strategically located for some type of large scale development, which would serve as a buffer between the proposed ramps and the residential area to the south. The neighborhood presently has a mixture of zoning districts, including both City of Springfield and Sangamon County Zoning Districts, i.e., R-2, R-3, R-4, R-5, B-1, B-2 and B-3.

Since we are in the age of the automobile, it is reasonable to presume that any development at subject's location will cause additional vehicles to enter and exit the project. However, with good planning, the additional vehicles should not have a negative influence on properties located to the south and east. Properties to the west are low quality and will probably be cleared in the foreseeable future to make room for a more intense use. I anticipate that to happen about the time the ramps for the Madison Street Corridor are opened for traffic.

In my judgment, a large scale development in the R-5b General Residence and Office District at subject location, properly planned, would not have an adverse influence on adjoining and nearby properties.''

Butcher did not make a determination of the highest and best use of the property since the appraisal assignment requested estimates for R-5(b) and R-3 zoning. Butcher appraised the property at $111,500 for R-3 and $184,250 for R-5(b) zoning.

In addition, the trial court had affidavits and depositions to consider. Alderman Irv Smith, in his deposition, admitted the proposed ramp would make the property less attractive. He thinks maybe 10 single-family residences could be built on the property. He talked to the individual defendants in this case about the rezoning and he indicates those defendants were concerned about increased traffic destroying their neighborhood, but he did not discuss this matter with the Traffic Engineering Department for the City of Springfield. According to the alderman, people were concerned that more than 100 cars per day would drive into the neighborhood to drop off and pick

up children. The proposed ramp would also increase the traffic. The alderman also found it undesirable that 8 or 10 employees would be needed to care for roughly 100 children, thereby increasing density. The alderman admitted, however, that a church or school allowed under an R-3 zoning classification would have the same or greater density.

Alderman Allan Woodson was also deposed. In his deposition Woodson stated he voted against changing the zoning from R-3 to R-5 because he believed R-5 was too broad a category for the area, because he received letters intimating an increase in traffic might result, and because he was particularly sensitive to disrupting the well-established neighbors. Woodson did not contact the traffic department of the City or any other technical people with respect to the effects of the zoning reclassification. He was not aware of a State schedule to take over an acre of the property. He did not view this property, and other than at public meetings, the only alderman he spoke with concerning the zoning of the subject property was Irv Smith. Woodson is not a traffic engineer and would therefore not speculate as to whether the ramp would increase traffic in the area even assuming the subject property remained vacant. However, he did recognize the corridor handles a large volume of traffic, indicating it would be fair to conclude there would be more traffic on the road than exists there now. Woodson says he advocates compatibility between existing neighborhoods and commercial developments to ensure neighbors are not going to be infringed upon by some new pursuit.

Excerpts of the deposition of Harry Hopkins, Director, of the Springfield-Sangamon County Regional Commission, were also submitted to the court. In his deposition, Hopkins indicates the Springfield comprehensive plan-land use plan was adopted by the City in 1983. The Commission is an advisory board and assisted in the development of this plan. In reviewing the application for zoning reclassification, the Commission foresaw no problem with traffic flow and expected the volume of traffic would be increased only slightly. As future land use for this particular piece of property, the comprehensive plan projected a multiple-family use, and duplex is not considered multiple family. The property adjacent on the east side of the subject property, and extending southward, was rezoned R-5 in 1983 by the city council. The ramp at Amos and Jefferson Streets is included in this five-year plan of the Illinois Department of Transportation (DOT), although work is not planned to begin immediately. Since the Commission reviewed the zoning reclassification application, nothing has occurred to change Hopkins' mind concerning the recommendation of

the Commission. After looking at existing land use, the existing trends of development in the area, and the existing plans of the City, the Commission determined the subject property was suited to the proposed use.

In an affidavit submitted by the City in opposition to the motion for summary judgment, Hopkins made the following statements:

"4. Although the recommendation of the [Regional Commission] was that the City Council grant R-5(b) zoning to the subject property, R-4(d) general residence district zoning is also appropriate for the property and consistent with the terms of the current City Comprehensive Plan.

5. I do not consider the R-5(b) zoning re-classification that was recommended to be more appropriate than an R-4 zoning re-classification."

Also deposed was Robert Davison, a member of the Springfield Planning and Zoning Commission since 1986 and a member of the Zoning Board of Appeals from 1980 to 1986. Davison believed a daycare center would be an appropriate use for the subject property. Davison voted to recommend an R-5(b) zoning reclassification. He explained his reasons for so voting:

"Okay, this is an area that is surrounded by four different zoning classifications, R-3, B-1, R-5, R-4. So, the question became what should this property be zoned when it's in the middle of all those others. The possibilities I felt were R-3, R-4, R-5 and B-1, because it connects all those zoned properties. I felt that B-1 would not be appropriate because although it may be appropriate at the extreme north end along Jefferson Street B-1 is not appropriate next to R-3, and even perhaps R-4 or R-5, but I think particularly to the south B-1 would not be appropriate. R-3 I felt is not appropriate for the property, because I think practically single family developments in that area simply will not, are not proper. There has been no to my knowledge single family developments that close to Jefferson Street within the last ten, 15 years. So, I felt that was inappropriate. Also if it is inappropriate to have an R-5 next to an R-3, then it would be improper to zone this property R-3 when it's next to B-1 on the north and R-5 on the east. So, it came down to R-4 and R-5. R-4 would not allow the day care center. It would just be apartments. Now, the density in R-5 is less than, or in R-4 is less than R-5. I felt that this, the petitioner should be entitled to multi-family housing here, and considering the R-3 to the south and west I felt that the day care cen-

ter would be more appropriate than simply multi-housing, because there would be traffic during business hours morning and evening rush hours, but the day care center probably wouldn't operate normally on the evenings and weekends. So, I felt that that would be less of a problem in the residential areas during the times that most people are there in the residences that is nights and weekends. So, I felt that R-5 was appropriate here, in part a buffer, that R-5 can be used as a buffer as well. I felt both R-4 and R-5 were reasonable, and I felt that the day care center in my judgment was better for this property than straight multi-family."

In an affidavit submitted by the City in opposition to the motion for summary judgment, Davison stated his opinion that "R-4 zoning is as appropriate as R-5 for the subject property" and he "would have voted to recommend R-4 rather than R-5(b) because the density limits allowed on the R-4 districts are more compatible with the area surrounding the subject property than the density allowed in the requested R-5(b) classification."

By suggesting R-4 zoning classification is appropriate, the City concedes R-3 is unreasonable. Two advisory boards recommended reclassification to R-5(b), then the city council, ignoring these recommendations and based on the apprehension of possible increased traffic, without apparently referring to any technical advisors to determine the reasonableness of these apprehensions, refused to rezone.

The City's argument focuses on R-5(b) zoning classification as being inappropriate. That may have been a consideration for the city council, but the court's focus is on the proposed use. Is the use of this property as a day-care center reasonable, and is the zoning ordinance which prohibits such a use unreasonable and arbitrary?

Of paramount importance is whether the zoning of the subject property conforms to the existing uses of the surrounding properties and whether the existing uses of the surrounding properties are uniform and established. (*La Grange State Bank v. County of Cook* (1979), 75 Ill. 2d 301, 388 N.E.2d 388.) Basically the area is R-3, with some R-4 (multiple family) to the east. To the north and across Jefferson, the property is zoned R-3 and B-1 (highway business service district) and is used for commercial purposes. The property adjacent on the east and extending south is R-5. The City suggests that the business uses across Jefferson should not be considered in determining the reasonableness of the zoning and proposed use of the subject property. It is true that streets are reasonable lines of demarcation

between residential and other uses, and merely because a property is located on a main traffic artery does not invalidate an ordinance restricting it to residential use. (*Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 402 N.E.2d 719.) Here, however, not all office use is confined to the other side of Jefferson Street, apparently, and even Briggs noted the trend along Jefferson Street is to commercial use. He did not restrict his comments to the side of Jefferson opposite of plaintiff's property. In addition, the street is being revamped, directly impacting this piece of property.

Also to be considered is the extent to which property values are diminished by the existing zoning. While the factor is to be considered, it is not determinative that the property would be worth more if the zoning was reclassified since that is true in virtually all reclassification cases. (*Grobman v. City of Des Plaines* (1975), 59 Ill. 2d 588, 322 N.E.2d 443.) *Grobman* recognized that the property owner may challenge the zoning, but if the owner was aware of the restriction at the time of purchase, that owner is in a less sympathetic position than would be the owner whose use of the land was restricted after the purchase. Here, plaintiff purchased the land for what it was worth when zoned R-3. There is no diminution in value because of the zoning, although the property would be worth more if rezoned.

The length of time the property has been vacant as zoned is another consideration. In *Amalgamated Trust*, the court indicated that the plaintiff must prove the property is unsalable, vacant, or undeveloped because of the zoning. There must be proof that improper zoning caused the vacancy, not that the property remained vacant merely because no one attempted to develop it or because of some other reason not zoning related. The court pointed out that vacant property is often permitted to remain undeveloped in the hope for a zoning reclassification which will enhance its value. While it is true, as plaintiff argues, that undeveloped land generally is of no benefit to the owner or public, merely because the subject property has been vacant since 1955 does not necessarily mean the property could not have been developed under the R-3 classification. It may only mean that the previous owners, seeing the development along Jefferson, speculatively held the property. On the other hand, the fact it is currently unimproved property and a conforming existing use need not be discontinued can be considered.

Two related factors are the extent to which the diminution of plaintiff's property values promote the health, safety, morale, or general welfare of the public and the relative gain to the public com-

pared to the hardship imposed on plaintiff. In this case, since the property is vacant, plaintiff's hardship is that he will be deprived of the increased value of the land and any potential income from the day-care center. It has not been shown, however, that building a day-care center is more profitable than building apartments, houses, or duplexes. Yet, it is hard to understand how a vacant piece of property promotes the health, safety, morale, or general welfare of the public. The only facts presented on those issues seem to concern the question of increased traffic. In recommending the reclassification, the advisory boards considered traffic and decided there would not be such a significant increase in traffic as would warrant a refusal to rezone R-5(b). Two aldermen testified in depositions that they voted against rezoning because of fears of increased traffic without ever having investigated this question with the City's traffic department. Therefore, the trial court could rely on the recommendation of the advisory boards where the facts before the court do not support the contrary ruling by the city council. Furthermore, there is no evidence that the construction of apartments, houses, or duplexes in this area would create less traffic or density. In fact, Alderman Smith admitted some permitted R-3 uses could create greater traffic and density problems than would a day-care center.

The suitability of the property to the uses for which it is presently zoned is changing because of the changes in the street. From a commonsense point of view, few people are going to want to buy a home that close to a busy street. And even Briggs argues the property should be reclassified, although he would suggest R-4(d) rather than R-5(b). Neither party really argues this factor very well. Houses can be built there, but will people buy them? The change in the street could make the property even less suitable for the existing zoning, and by relying on Brigg's appraisal, which recommends a zoning reclassification, the City concedes that.

The last two factors to consider are those from *Sinclair Pipe Line Co.*, the public need for the proposed uses and the thoroughness with which the City planned and zoned its land use. The only evidence of need is the affidavit by plaintiff concerning his investigation of the need for a day-care center. No contrary evidence was presented by the City. No other evidence having been submitted, the trial court could reasonably find a public need for a day-care center.

Plaintiff concedes the City has adopted an extensive comprehensive plan. At the same time, the City admits that the uses of the property designated by the plan most closely correspond to R-4 for the north two-thirds and R-3 for the south two-thirds. Furthermore,

the plan provides a means for changing zoning classifications, indicating a flexibility in the plan.

In this case, plaintiff sought to have the classification changed from R-3 to R-5(b). In *Amalgamated Trust*, the court said:

"[W]hile a plaintiff who has proven [*sic*] that the proposed use is reasonable need not also prove that all possible intervening classifications would be arbitrary and unconstitutional [citations], it cannot be said that such classifications are totally irrelevant." (*Amalgamated Trust*, 82 Ill. App. 3d at 380, 402 N.E.2d at 728.)

Nevertheless, based on all the facts before the trial court, after applying the appropriate factors, it is clear the trial court correctly determined the R-3 zoning classification of this particular piece of property was arbitrary and unreasonable if the zoning classification fails to permit the proposed use. The next question to decide is whether, upon invalidating the zoning ordinance as applied to the subject property, the trial court has authority to reclassify the zoning of the subject property or may merely allow plaintiff's proposed use.

In this case, the court decreed as follows:

"IT IS THEREFORE ORDERED ADJUDGED AND DECREED that the Plaintiff's Motion for Summary Judgment is hereby allowed.

IT IS FURTHER ORDERED ADJUDGED AND DECREED that the classification of the aforedescribed real estate as R-3, Single Family Residence and Duplex District, by the Defendant, City of Springfield, is hereby declared to be void and of no further force or effect.

IT IS FURTHER ORDERED ADJUDGED AND DECREED that Plaintiff shall be allowed to develop the Plaintiff's aforedescribed real estate in accordance with the R-5(b), General Residence and Office District, classification of the zoning ordinance of the City of Springfield and the Defendant, City of Springfield, is hereby prohibited from interfering with the Plaintiff's development of said real estate.

IT IS FURTHER ORDERED ADJUDGED AND DECREED that nothing herein shall prohibit the Defendant, City of Springfield, from enforcing the provisions of its building code ordinances.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Court retains jurisdiction to enforce the terms of this Judgment."

The portion of the decree to which the City previously objects is

the third paragraph. The City's objection is that by rezoning the subject property to R-5(b), the trial court is allowing plaintiff to develop the property with any R-5(b) use rather than restricting its development to the day-care center proposed.

It would seem the trial court's decree is overbroad. The leading case in this area is *Sinclair Pipe Line*. In that case, the Illinois Supreme Court said:

"Normally the land owner is interested particularly in a specific use which he proposes, and so it is natural that he will try the case and the judge will reach his decision in terms of the reasonableness of excluding that specific use. These factors account for the emphasis on the particular proposed use found in the *Tower Cabana Club* and some other cases.

Because zoning cases are tried in this manner, two equally undesirable consequences may ensue if, following the approach of the *LaSalle Bank case*, the property is left unzoned as the result of a decree declaring a zoning ordinance void. The municipality may rezone the property to another use classification that still excludes the one proposed, thus making further litigation necessary as to the validity of the new classification. [Citations.] The present case illustrates the other possibility:—that a decree which was induced by evidence which depicted a proposed use in a highly favorable light would not restrict the property owner to that use, and he might thereafter use the property for an entirely different purpose.

In our opinion, it is appropriate for the court to avoid these difficulties by framing its decree with reference to the record before it, and particularly with reference to the evidence offered at the trial. In most of the cases that have come before us in recent years, a specific use was contemplated and the record was shaped in terms of that use. In such cases the relief awarded may guarantee that the owner will be allowed to proceed with that use without further litigation and that he will not proceed with a different use." *Sinclair Pipe Line*, 19 Ill. 2d at 378-79, 167 N.E.2d at 411.

■■■ Under the facts of this case, paragraph 2 of the decree should not have declared the R-3 zoning classification void as to the property but the restriction therein void as to the proposed use of the property, and paragraph 3 should not have rezoned the property, but leaving the zoning at R-3, allowed plaintiff, nevertheless, to proceed with the specific proposed use, or day-care center, only. Therefore, while arguing that granting the summary judgment in favor of plain-

tiff was proper in this case, we must reverse in No. 4—88—0836, because the order entered was overbroad. The cause will be remanded to the circuit court of Sangamon County for the entry of a new order not inconsistent with this opinion.

We next consider whether the trial court properly dismissed count II, alleging an improper taking of property in violation of the fifth amendment of the Constitution of the United States, for failure to state a cause of action. Count II of plaintiff's complaint alleges the subject property could not be "economically" developed under an R-3 zoning classification, the only economically feasible development would require an R-5(b) zoning classification, and therefore, the City's refusal to rezone prohibited plaintiff from utilizing the property to the highest and best use, constituting a taking without payment of just compensation. The City filed a section 2—615 motion to dismiss (Ill. Rev. Stat. 1987, ch. 110, par. 2—615), alleging count II failed to state a cause of action because plaintiff did not allege he was deprived of all use of the property and because section 2—104 of the Local Government and Governmental Employees Tort Immunity Act (Ill. Rev. Stat. 1987, ch. 85, par. 2—104) provides that a local public entity is not liable for an injury caused by denial of an approval or authorization where the entity is authorized by enactment to determine whether or not such authorization would be issued, denied, suspended, or revoked. On August 23, 1988, count II was dismissed. The City's second ground for dismissal in the motion has been abandoned on appeal.

The parties cite several United States Supreme Court cases which discuss the principles applicable to prohibiting the taking of property without just compensation. Most are not factually similar to the case at bar.

The cited cases most apropos to the case at bar are two: *First English Evangelical Lutheran Church v. County of Los Angeles* (1987), 482 U.S. 304, 96 L. Ed. 2d 250, 107 S. Ct. 2378, and *MacDonald, Sommer & Frates v. County of Yolo* (1986), 477 U.S. 340, 91 L. Ed. 2d 285, 106 S. Ct. 2561. In *First English Evangelical Lutheran Church*, a flood destroyed all the buildings on the property on which the church operated a facility for retarded children. After the flood, the county adopted an interim ordinance barring the construction or reconstruction of any buildings in the flood protection area, which included plaintiff's land. It was held that, even where plaintiff was only temporarily deprived of *all* use of a property, the plaintiff was entitled to just compensation under the fifth amendment. On the other hand, *MacDonald, Sommer & Frates* decided that a county

planning commission's rejection of a subdivision proposal was not a sufficient taking as to give rise to a claim under the fifth amendment where the State court left open the possibility that some development of the property could be permitted by finding that the denial of this particular subdivision plan did not equate with a refusal to permit any development.

Based on these cases, plaintiff has no cause of action. Plaintiff was not deprived of all use of his land. The denial of an R-5(b) zoning classification did not equate with a refusal to permit any development. The dismissal of count II, our case No. 4—88—0879, is affirmed.

Before discussing the issues involving count III, two motions taken with the case in No. 4—88—0860 must be noted. The first is a motion by the individual defendants to dismiss the portion of plaintiff's appeal concerning the awarding of attorney fees. Defendants suggest this issue is moot since plaintiff's attorneys have already paid the full amount of the award, and a release has been given. Plaintiff responds by arguing the issue is not moot even though the payment has been made because the payment was not voluntary, having resulted from the order of this court denying plaintiff's attorneys' motion to file a late notice of appeal.

The trial court's basis for awarding attorney fees was that count III of the lawsuit was frivolous. (Ill. Rev. Stat. 1987, ch. 110, par. 2—611.) The determination of whether or not the count was frivolous is closely tied to a consideration of the propriety of the dismissal. In addition, this court may still address questions which would otherwise be considered moot if this is the type of error likely to recur and a determination would avoid occurrence of the error in the future. (*People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 104 N.E.2d 769.) Therefore, further discussion of this motion will be reserved until the dismissal can be analyzed.

The second motion also concerns attorney fees. Plaintiff moved to strike a "motion" included in defendants' brief asking for section 2—611 attorney fees on appeal. Plaintiff's motion argues that Supreme Court Rule 361 (107 Ill. 2d R. 361) does not provide that a motion may be filed as a part of a brief. Defendants' response is that Rule 361 does not expressly prohibit it. This court need not, however, decide whether the form of the motion is proper since this court has already decided section 2—611 is not applicable to appeals. (*Darnall v. City of Monticello* (1988), 168 Ill. App. 3d 552, 522 N.E.2d 837.) As a result, defendants' "motion" for section 2—611 fees on appeal is denied and plaintiff's motion to strike is denied.

With regard to count III, the issues are whether the trial court

properly dismissed the defamation count against the individual defendants and awarded attorney fees to defendants pursuant to section 2—611 and whether the trial court erred by prohibiting plaintiff from pursuing discovery against the individual defendants. Count III was dismissed on the motion of the defendants. Count III of plaintiff's complaint makes the following allegations against the individual defendants:

"1-9. The plaintiff repeats and re-alleges paragraph One (1) through Nine (9) of Count I as Paragraphs 1, 2, 3, 4, 5, 6, 7, 8 and 9 of this, Third Count.

10. That the Defendants, Richard J. Zimmerman, Timothy Call and James A. Rogers, with intent to prevent the Plaintiff from obtaining the relief requested in Plaintiff's Petition for Re-Classification, Exhibit B, spoke with and discussed with persons who lived near the Subject Property and other persons concerning the Plaintiff's proposed development of the Subject Property.

11. That the Defendants, Richard J. Zimmerman, Timothy Call and James A. Rogers, represented to the aforesaid persons, some or all of the following information concerning the Plaintiff's proposed development of the Subject Property:

a. The proposed day care facility would be open 24-hours a day;

b. The proposed day care facility would be owned and/or operated by St. John's Hospital;

c. The proposed day care facility would be directly North of 260 North Columbia Avenue;

d. The proposed day care facility would have and/or accommodate several hundred children;

e. The proposed day care facility would increase traffic flow by 300 to 400 vehicles per day;

f. The proposed day care facility is the same one originally proposed for an East side area of the City of Springfield; and

g. Other remarks to discredit the proposed day care center;

12. That the Defendants, Richard J. Zimmerman, Timothy Call and James A. Rogers, made the aforesaid representations with the knowledge that said representations were false or in complete disregard of the truth or falsity of said representations.

13. That the Defendants, Richard J. Zimmerman, Timothy Call and James S. Rogers, made the aforementioned misrepresentations without legal justifications.

14. That the Defendants, Richard J. Zimmerman, Timothy Call and James A. Rogers, made the aforesaid false representations with the intent to discredit the Plaintiff's proposed development of the Subject Property and in an effort to deny the Plaintiff the relief requested in Plaintiff's Petition for Re-Classification, Exhibit B.

15. That as a result of the aforesaid misrepresentations by the Defendants, Richard J. Zimmerman, Timothy Call and James A. Rogers, several persons were induced to oppose the Plaintiff's Petition for Re-Classification, Exhibit B, and the Defendant, City of Springfield, denied the Plaintiff's Petition for Re-Classification, Exhibit B.

16. That as a result of the aforesaid misrepresentations by the Defendants, Richard J. Zimmerman, Timothy Call and James A. Rogers, the Plaintiff has suffered and will continue to suffer damages:

a. by reason of the loss of use of the Subject Property to its highest and best use;

b. increased cost because of the delay in the development of the Subject Property as a day care facility or any other use permitted in R-5(b), General Residence and Business District;

c. loss of profits from the use of the Subject Property as a day care facility or any other use permitted in R-5(b) General Residence and Business District; and

d. expenses in overcoming the aforesaid misrepresentations."

Paragraphs 1 through 9 of count I allege the general facts concerning ownership, zoning, and procedures followed by plaintiff to get the zoning reclassification, as already set forth.

Whenever the granting of a motion to dismiss is reviewed, all well-pleaded facts alleged in the complaint are taken as true, and the test for determining the propriety of granting the motion to dismiss is whether it appears no set of facts may be proved so as to entitle plaintiff to recover from defendants. (*Wheeler v. Caterpillar Tractor Co.* (1985), 108 Ill. 2d 502, 485 N.E.2d 372, *cert. denied* (1986), 475 U.S. 1122, 90 L. Ed. 2d 187, 106 S. Ct. 1641; *Johnston v. City of Bloomington* (1979), 77 Ill. 2d 108, 395 N.E.2d 549.) Any allegations which are merely conclusions, unsupported by allegations of specific facts, are not admitted, however. *Howell v. Blecharczyck* (1983), 119 Ill. App. 3d 987, 457 N.E.2d 494.

In addition to defamation, plaintiff raises the specter of a number of possible torts applicable to the facts of this case: injurious

falsehood, interference with or inducement to breach a contract, interference with a business relationship, and slander of title. This is not a case involving slander of title. Slander of title is the false and malicious publication of oral or written words which disparage a person's title to property and result in special damages. (*Whildin v. Kovacs* (1980), 82 Ill. App. 3d 1015, 403 N.E.2d 694.) No such allegation concerning a cloud on title is made in the complaint.

In *Resudek v. Sberna* (1985), 132 Ill. App. 3d 783, 790, 477 N.E.2d 789, 794, the torts of interference with a contract and interference with a prospective business or contractual relationship were discussed. It is sufficient to say plaintiff alleges no contract or potential business relationship with which defendants interfered and therefore has not pleaded a cause of action for either of these torts.

The relationship between defamation and commercial disparagement is discussed in *Crinkley v. Dow Jones & Co.* (1978), 67 Ill. App. 3d 869, 385 N.E.2d 714. Therein, the court pointed out that the two torts are distinct and separate, words impugning integrity or credit forming the basis of defamation and words criticizing the quality of goods or services forming the basis of disparagement. The *Crinkley* court also considered the tort of interference with a prospective economic advantage. After discussing several cases, the court concluded the plaintiff must allege some identified or identifiable third party with whom plaintiff had an expectancy of doing business. In the case at bar, plaintiff has not identified third parties with whom he expects to do business, even in general terms. Under *Crinkley* and *Parkway Bank & Trust Co. v. City of Darien* (1976), 43 Ill. App. 3d 400, 357 N.E.2d 211, plaintiff's complaint is insufficient to support a claim for commercial disparagement.

Plaintiff quotes the Restatement (Second) of Torts, section 623A, to support his argument that his complaint states a cause of action for injurious falsehood:

"Liability for Publication of Injurious Falsehood—General Principle.

One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if:

(a) he intends for publication of the statement to result in harm to interests of other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity." (Restatement (Second) of Torts §623A, at 334 (1977).)

Plaintiff suggests the *Whildin* case and *Pecora v. Szabo* (1981), 94 Ill. App. 3d 57, 418 N.E.2d 431, adopt this section of the Restatement and thereby the tort of injurious falsehood. However, both of these cases cite this section of the Restatement only for the proposition that plaintiff must plead and prove malice and that strict liability is rejected as a theoretical basis for these types of torts. Both cases are slander of title cases and do not discuss a separate tort of injurious falsehood.

We need not decide whether to recognize injurious falsehood as a tort separate and distinct from commercial disparagement because, as will be seen from the discussion of defamation, the failure to plead a proximate causal connection between the alleged statements and the damages allegedly incurred render the dismissal a correct determination regardless of the characterization of the tort.

 █ The final question, then, is whether plaintiff's complaint can be said to state a claim for defamation. Oral defamation, as here, is called slander. Defamation is the publication of disreputable untruths about another to a person other than the defamed. (*Whitby v. Associates Discount Corp.* (1965), 59 Ill. App. 2d 337, 207 N.E.2d 482.)

> "The gravamen of an action for defamation is not the injury to plaintiff's feelings, but damage to his reputation in the eyes of other persons. Even though the words used are not defamatory, if they are false an action may lie to recover such special damage as is the natural and proximate consequence of the wrongful act complained of.
>
> Defamatory words may be divided into those words which are actionable per se, and those which are actionable per quod. The difference between defamatory words actionable per se and those which are actionable per quod is that in those words which are actionable per se damages need not be specially proved and malice will be implied, whereas in those words which are actionable per quod only, malice and damages must be proved." (33A Ill. L. & Prac. *Slander & Libel* §11, at 23-24 (1970).)

Those statements which are slander *per se* at common law in Illinois are: (1) imputing a criminal offense to another; (2) imputing that another is infected with a communicable disease which, if true, would tend to exclude the person from society; (3) imputing that a person is unable to perform or lacks integrity in the discharge of the duties of the person's office or employment; and (4) prejudicing a person in that person's profession or trade. (*Coursey v. Greater Niles Township*

*Publishing Corp.* (1967), 82 Ill. App. 2d 76, 227 N.E.2d 164.) By statute, false accusations of fornication, adultery, and false swearing are also actionable as a matter of law. Ill. Rev. Stat. 1987, ch. 126, pars. 1, 2.

Whether a statement constitutes slander *per se* is a question of law. (*Resudek*, 132 Ill. App. 3d 783, 477 N.E.2d 789.) In determining whether an alleged statement is actionable *per se*, the trial court must consider the statements in context, and give the words and implications therefrom their natural and obvious meaning. If the words may reasonably be interpreted innocently, or may reasonably be interpreted as referring to someone other than plaintiff, the statement is not actionable *per se*. (*Costello v. Capital Cities Communications, Inc.* (1988), 125 Ill. 2d 402, 532 N.E.2d 790; *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 442 N.E.2d 195.) However, in this case plaintiff alleged special damages and therefore it would appear plaintiff alleges defamation *per quod*, not *per se*. (See *Owen v. Carr* (1986), 113 Ill. 2d 273, 497 N.E.2d 1145.) Moreover, the allegations do not fit into any of the categories of slander *per se*. Even if plaintiff would have been prevented from completing this project, that probably does not constitute prejudicing him in his trade or profession in the sense plaintiff would not be prevented from working on other projects because of some prejudice against plaintiff in the profession. It is difficult to see how plaintiff's personal reputation is attacked by these statements and plaintiff does not plead inferences from the alleged statements which would diminish his reputation.

In addition, there exists a constitutional privilege for expression of opinion (*Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 41 L. Ed. 2d 789, 94 S. Ct. 2997), and the determination of whether a statement is an expression of opinion is also a question of law involving construing the language in context. (*Owen*, 113 Ill. 2d 273, 497 N.E.2d 1145.) Yet, a statement of opinion which implies the existence of an undisclosed defamatory fact is actionable. (*Howell*, 119 Ill. App. 3d 987, 457 N.E.2d 494.) Whether an alleged statement is construed as a statement of opinion or a statement of fact often depends on the language employed. For example, because the letter which was the subject of litigation in *Stewart v. Chicago Title Insurance Co.* (1987), 151 Ill. App. 3d 888, 890, 503 N.E.2d 580, 581, used the language " 'you *may* be involved,' " " '[m]y *guess* is,' " " '[t]heir theory *seems* to be,' " and " 'the recorded Declarations lead me to *believe*' " (emphasis added), this court determined the letter involved a statement of opinion. The *Stewart* decision adopts a four-part test for determining whether a statement is protected opinion: (1) does the common us-

age or meaning of the specific terms or language have a precise core of meaning for which there is a consensus of understanding or is the language indefinite or ambiguous; (2) would a reasonable person perceive the statement to have a specific factual content, making it believable; (3) considering the context of the statement, would surrounding language influence a person's readiness to infer the statement has a factual context; and (4) the court should consider the audience to whom the statement is publicized and whether the audience is likely to understand the statement to be one of fact or opinion. For all these reasons, the complaint must set forth the alleged defamatory statements with specificity, otherwise it is impossible to know whether the communication supports a cause of action. *Heying v. Simonaitis* (1984), 126 Ill. App. 3d 157, 466 N.E.2d 1137.

In this regard, count III of plaintiff's complaint is deficient. The precise statements are not alleged. The court cannot determine the context in which the statements were made, either to determine whether the statements may reasonably be given an innocent construction or to determine whether these statements are merely expressions of opinion. Should every concern or rumor expressed in the neighborhood concerning rezoning a particular piece of real estate be actionable? Although such concerns and questions may be less than artfully stated, the issue would then be one of malice. Whether defendants acted with malice would be a question for the jury. (*Resudek*, 132 Ill. App. 3d 783, 477 N.E.2d 789.) Similarly, whether the remarks proximately caused plaintiff's damages is also generally a question of fact. (See *Merlo v. Public Service Co.* (1942), 381 Ill. 300, 45 N.E.2d 665.) But when reviewing the granting of a motion to dismiss, all well-pleaded allegations of facts, including allegations of causal relationship, are taken as true. *Edgar County Bank & Trust Co. v. Paris Hospital, Inc.* (1974), 57 Ill. 2d 298, 312 N.E.2d 259.

At the hearings in the trial court, defendants' arguments concerning proximate cause centered on the fact the council voted down the rezoning. According to defendants' argument, even if defendants publicized the allegedly defamatory remarks to several people, there is no causal connection since the council votes, not the neighborhood residents. City council members are often swayed by the opinions of voters, particularly those who sign petitions. As will be seen, petitions were distributed to local residents and presented to the council in order to prevent the rezoning. These facts were not alleged. It is also clear plaintiff has not alleged any facts from which the court could reasonably find the comments by defendants to their neighbors proximately caused the city council's decision or the alleg-

edly resultant damages. Plaintiff merely alleges defendants made false representations knowing the same to be false, or in disregard of the truth or falsity with the intent to discredit plaintiff's project and to induce opposition thereto and, as a result, plaintiff suffered damages.

■■■ Defendants raise an additional argument in support of the dismissal. Defendants contend the alleged statements by defendants were absolutely privileged as being made as part of a quasi-judicial proceeding. (See *Parker v. Kirkland* (1939), 298 Ill. App. 340, 18 N.E.2d 709.) This argument ignores the fact the case is proceeding on a motion to dismiss and nowhere in the complaint is it alleged the statements were made in a quasi-judicial proceeding. Defendants rely on *Streif v. Bovinette* (1980), 88 Ill. App. 3d 1079, 411 N.E.2d 341. However, *Streif* does not say plaintiff has no cause of action for defamation. Instead, the *Streif* court merely refused to enjoin the defendants from seeking redress from government agencies under the facts of that case.

In the motion to tax attorney fees under section 2—611, the defendants refer to transforming the section 2—615 motion to dismiss to a section 2—619 motion when, on July 25, 1988, in addition to a reply to memorandum in opposition filed by the plaintiff on defendants' motion to dismiss, defendants also filed an affidavit by Richard Zimmerman and an affidavit of Joy Fitzgerald. Zimmerman's affidavit says he was the only objector to speak before the city council, he attached a copy of the written speech he prepared and delivered before the council, and he attached true and correct copies of petitions filed with the council. The petitions, apparently signed by a considerable number of local residents, ask that the property not be reclassified so as to permit its use as a day-care facility. The names of the circulators of the petitions appear at the bottom of each petition. Two named defendants, Zimmerman and Call, were circulators.

Nothing in Zimmerman's affidavit refers to any statements made to area residents while the petitions were circulated or at any other time. Fitzgerald's affidavit refers to a newspaper article which has nothing to do with the defendants' qualified-privilege contention. For these reasons, defendants' contention is without merit.

■■■ In addition, the commingling of the motions was inappropriate. Section 2—619 allows for the filing of a motion for involuntary dismissal based on defects or defenses enumerated in the statute. Under section 2—619(a)(9), a defendant may seek dismissal if the claim is barred by any affirmative matter avoiding the legal effect of or defeating the claim even though it is not specifically enumerated some-

where else in the statute. If the ground for dismissal is not evident from the face of the pleading, the motion may be supported by affidavit. The failure to allege special damages and the failure to state a cause of action are not such affirmative matters precluding relief under section 2—619. (*Rowan v. Novotny* (1987), 157 Ill. App. 3d 691, 510 N.E.2d 1111.) In *Rowan*, the court criticized the commingling of sections 2—615 and 2—619 motions, requiring the reviewing court to speculate as to the trial court's bases for granting the motion to dismiss. However, in the case at bar, it does not appear plaintiff ever objected to the hybrid nature of the motion in the trial court, nor does plaintiff raise the issue on appeal. The failure to object to such a hybrid motion has been held to constitute a waiver of any issue concerning the form of the motion on appeal. *Economy Fire & Casualty Co. v. GAB Business Services, Inc.* (1987), 155 Ill. App. 3d 197, 507 N.E.2d 896.

It is of some concern in this case whether plaintiff should have been allowed to amend count III to allege the statements with greater specificity. The motion to dismiss was filed on June 30, 1988. The motion was granted on July 25, 1988. In the meantime, plaintiff attempted to initiate discovery, but the court refused to allow plaintiff to proceed with discovery.

▬ The purpose of discovery is to ascertain the truth and to expedite the disposition of the litigation. (*Bee Chemical Co. v. Service Coatings, Inc.* (1969), 116 Ill. App. 2d 217, 253 N.E.2d 512.) It is designed to enable one party to discover relevant information from other parties to the litigation or from third parties (*Redmond v. Central Community Hospital* (1978), 65 Ill. App. 3d 669, 382 N.E.2d 95), such as the identities and addresses of persons with knowledge of the occurrence which is the subject of the litigation. (*Carlson v. Healey* (1966), 69 Ill. App. 2d 236, 215 N.E.2d 831.) "Litigation is not to be regarded today as a battle of wits, but should be directed toward a discovery of the facts and an application of the law so that justice may be done." (*Tansey v. Robinson* (1960), 24 Ill. App. 2d 227, 235, 164 N.E.2d 272, 276.) In *Slatten v. City of Chicago* (1973), 12 Ill. App. 3d 808, 813, 299 N.E.2d 442, 445-46, the court stated:

> "The right of any party to a discovery deposition is basic and fundamental in today's adversary system, and, accordingly, the right of one party imposes a duty on the other party. That duty cannot be avoided by technical maneuvers or other conduct which results in destroying the purpose of modern discovery principles."

Of relevance to this case, and the cases cited by the parties, is Su-

preme Court Rule 201 (107 Ill. 2d R. 201), which states, in relevant part:

"(c) **Prevention of Abuse.**

(1) *Protective Orders.* The court may at any time on its own initiative, or on motion of any party or witness, make a protective order as justice requires, denying, limiting, conditioning, or regulating discovery to prevent unreasonable annoyance, expense, embarrassment, disadvantage, or oppression.

\*\*\*

(d) **Time Discovery May Be Initiated.** Prior to the time all defendants have appeared or are required to appear, no deposition or other discovery procedure shall be noticed or otherwise initiated without leave of court granted upon good cause shown."

In *Webster v. Midland Electric Coal Corp.* (1963), 43 Ill. App. 2d 359, 193 N.E.2d 212, the reviewing court, after recognizing the wide discretion granted to the trial court in controlling and directing discovery procedures, found there could be no error committed by the trial court in continuing the taking of discovery depositions until after the hearing on the motion to dismiss the second-amended complaint since the complaint was properly dismissed. The case of *In re Estate of Watson* (1984), 127 Ill. App. 3d 186, 468 N.E.2d 836, interprets Rule 201(d) and attempts to answer the question "when may discovery be initiated?" Discovery is premature without leave of court if initiated before all defendants have appeared or are required to appear. However, the court, citing *Crinkley*, rejected the contention that no right to discovery arises until a pleading is filed which states a valid cause of action. The court also pointed out that the discovery rules did not support such a contention.

In *Crinkley*, after upholding the striking of the counts of interference with a prospective economic advantage, the court determined the trial court committed an abuse of discretion by dismissing the counts with prejudice for failure to amend within 28 days, where plaintiff needed to pursue discovery to determine whether facts indicating defendants' intent to interfere could be alleged. The court specifically rejected defendants' argument that plaintiff was not yet entitled to commence discovery.

In the case at bar, pursuant to Rule 201(c) and on the motion of defendants, the trial court entered a protective order prohibiting plaintiff from pursuing discovery. Defendants' motion requested the discovery be delayed until after the court decided the motion to dismiss. In an order filed July 19, 1988, the trial court allowed the mo-

tion for a protective order and stayed the deposition until a hearing was conducted and ruling was made on the motion to dismiss.

The question here is not whether the parties were at issue, but whether plaintiff's count III was frivolous and designed merely to cause defendants to incur a great deal of expense in defending a lawsuit, including answering discovery. Therefore, the issue is not the timing under Rule 201(d), but the potential for unreasonable annoyance and expense under Rule 201(c)(1).

■■ Plaintiff does not argue that, if he had been permitted to conduct discovery, facts may have been discovered which could have been pleaded by way of amendment so as to state a valid cause of action. Similarly, plaintiff does not contend the granting of the protective order evidences a predisposition on the part of the judge to dismiss count III. Since plaintiff only argues "timing" and not the reasonableness to prevent unnecessary annoyance and expenses, plaintiff's argument misses the mark and it cannot be said the trial court committed an abuse of discretion. Since plaintiff has not suggested he could have discovered additional facts which if pleaded by way of amendment would have stated a valid cause of action, then the dismissal of count III, with prejudice, in case No. 4—88—0860, will be affirmed.

Lastly, our consideration returns to the first motion taken with the case in No. 4—88—0860, arguing the portion of the appeal relating to attorney fees should be dismissed since plaintiff's attorneys have already paid the fees taxed in the trial court. Although the issue may be deemed moot, this court will review the issue because of its importance, as discussed earlier. Accordingly, this motion is denied.

Section 2—611 of the Code (Ill. Rev. Stat. 1987, ch. 110, par. 2—611), states in relevant part:

> "Every pleading, motion and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. *** The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. *** If a pleading, motion, or other paper is signed in violation of this Section, the court, upon motion or upon its

own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee."

This paragraph of section 2—611 was amended by "An Act in relation to the insurance crisis" (Pub. Act 84—1431, eff. Nov. 25, 1986 (1986 Ill. Laws 3740)), and the amendment became effective November 25, 1986. This was a substantial change and the cases interpreting this portion of the prior statute are now only generally relevant. Ill. Ann. Stat., ch. 110, par. 2—611, Supplement to Historical and Practice Notes, at 19 (Smith-Hurd Supp. 1988).

After hearing arguments of counsel in this case, the trial court awarded attorney fees. The court stated no reason for the award, on the record, but indicated that at the time of hearing the motion to dismiss the court felt this was a proper case to award sanctions under section 2—611. In their motion for attorney fees the defendants allege as grounds: (1) count III was not well grounded in fact or warranted by existing law or a good-faith argument for reversal of existing law; (2) the plaintiff and his attorneys failed to present any precedent for the filing of such suit and to show a good-faith attempt to extend existing law; (3) plaintiff has stated publicly that his intent was to harm the defendants and not to recover any justifiable damages for any injuries; (4) the plaintiff and his attorneys have filed duplicitous discovery against the defendants in violation of supreme court rules, which caused the defendants to incur additional attorney fees necessary for a protective order, needlessly increasing the cost of litigation to the defendants; and (5) the actions of the plaintiff and his attorneys were harassing, embarrassing, oppressing, and caused the defendants undue expense and inconvenience.

Section 2—611 is almost identical to Rule 11 of the Federal Rules of Civil Procedure (Fed. R. Civ. P. 11), which requires counsel to study the law before filing a document with the court. (*Frisch Contracting Service Co. v. Personnel Protection, Inc.* (1987), 158 Ill. App. 3d 218, 511 N.E.2d 831.) Although no evidentiary hearing was conducted in this case on the question of attorney fees, plaintiff does not object on this ground. Under Rule 11, such a hearing is generally unnecessary where sanctions are based on a violation of the rule's objective standard of reasonableness, as opposed to the subjective standard of bad faith. Solovy, Hirsh & Brewer, *Sanctions Under Amended Section 2—611: Remedying Litigation Abuse*, 76 Ill. B.J. 486 (1988).

The standard of review of section 2—611 awards is whether the trial court committed an abuse of discretion. (*La Salle National Bank v. Union Oil Co.* (1988), 177 Ill. App. 3d 259, 532 N.E.2d 277.) In the case at bar, the plaintiff's attorneys filed suit on plaintiff's behalf without first ascertaining the precise statements which formed the defamation. In so doing, said attorneys failed to make a reasonable investigation to determine if the statements were statements of fact or statement of protected opinion, or if the statements could be innocently construed. In fairness to the attorneys, it should be pointed out that it appears letters were sent to local residents and some local residents responded thereto by signed statements to the effect that they were misled into signing the petitions or they refused to sign the petition because the resident was aware the representations made by one of the defendants were false. But there does not appear to have been any interviews conducted to ascertain whether the statements were actionable. In this case the court does not appear to have committed an abuse of discretion in granting such sanctions.

Accordingly, the orders of the circuit court of Sangamon County dismissing count II, in No. 4—88—0879, and dismissing count III of plaintiff's complaint and awarding attorney fees to the individual defendants, in No. 4—88—0860, are affirmed. The granting of summary judgment to plaintiff on count I in No. 4—88—0836 is reversed only insofar as the order entered therein is overbroad, and the cause is remanded to the circuit court to enter an order consistent with this opinion.

No. 4—88—0836, Reversed and remanded with directions.
No. 4—88—0860, Affirmed.
No. 4—88—0879, Affirmed.

KNECHT and GREEN, JJ., concur.